SIDNEY KIMMELMAN, A.K.A. SYDNEY OMARR, PETITIONER *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1392–76.     Filed May 9, 1979.

---

*Howard C. Alphson*, for the petitioner.
*James D. Vandever*, for the respondent.

SIMPSON, *Judge:* The Commissioner determined deficiencies in the petitioner's Federal income taxes as follows:

| Year | Deficiency |
|------|-----------|
| 1970 | $10,026 |
| 1971 | 28,199 |
| 1972 | 322 |

The parties have settled or conceded certain adjustments. The issues left for decision are: (1) Whether a guaranteed payment within the meaning of section 707(c) of the Internal Revenue Code of 1954[1] made by a partnership engaged in a trade or business is deductible even though it does not meet the requirements of section 162(a); (2) whether certain guaranteed payments were ordinary and necessary expenses or capital expenditures; (3) whether grapevines are "tangible personal property" within the meaning of section 179 and therefore eligible for the additional first-year depreciation allowance provided by such section; and (4) what is the fair market value of certain grapevines.

---

[1]All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue, unless otherwise indicated.

Some of the facts have been stipulated, and those facts are so found.

The petitioner, Sidney Kimmelman, a.k.a. Sydney Omarr, maintained his legal residence in Santa Monica, Calif., at the time he filed his petition in this case. He filed his Federal income tax returns for 1970, 1971, and 1972 with the Office of the Internal Revenue Service at Ogden, Utah.

Occidental Land Research (OLR) is a general partnership formed by William R. Decker and John Decker (the Deckers) in 1969. Since then, OLR has been active in real estate syndications in the areas of Ontario, Calif., and Cucamonga, Calif., and has organized approximately 75 limited partnerships for such purpose. In 1977, OLR was a general partner in at least 44 partnerships, 37 of which held land improved by grapevines. Prior to 1969, the Deckers were also active in real estate endeavors.

Occidental Construction Co., Inc. (OCC), was organized by the Deckers in 1963. From 1963 to 1968, OCC was engaged primarily in real estate development—building and promoting residential housing. After 1968, OCC ceased its real estate development activities and, except for its involvement in real estate syndication, was essentially a dormant corporation. However, just prior to trial, OCC again became actively engaged in real estate development.

During portions of 1971 and 1972, the petitioner was a limited partner in five limited partnerships (the partnerships): Devore Rochester, Ltd. (Devore); Redwood Baseline, Ltd. (Redwood); Rochester Seventh Street, Ltd. (Rochester Seventh); Rochester Eighth Street, Ltd. (Rochester Eighth); and Sultana Baseline, Ltd. (Sultana). OLR is the general partner in Devore, Redwood, Rochester Seventh, and Rochester Eighth. Richard Blindell, who was a salesman for OLR at one time, is the general partner in Sultana. OCC performed the same services for all five partnerships, and Sultana was operated in the same manner as the limited partnerships in which OLR was the general partner; therefore, in describing the operations of the partnerships, a reference to OLR in its capacity as a general partner will include Mr. Blindell.

During the late 1960's and early 1970's, there was a marked increase in the consumer demand for wine, and such increased

demand, together with generally favorable economic conditions, combined to create a boom in the wine industry. To meet the new demand for wine, thousands of acres of land, especially in northern California, were being purchased and converted to vineyards.

At the same time that vineyards were being developed in northern California, vineyards in southern California, especially in the Ontario-San Bernardino area, were suffering serious setbacks. A combination of smog, adverse weather conditions, industrial encroachment, and land speculation had seriously reduced the number of acres devoted to vineyards and diminished the productivity of the remaining acreage.

The Deckers were aware of the declining fortunes of the vineyards in the Ontario-San Bernardino area. Relying on their years of experience in real estate, they believed that much of the land devoted to vineyards in this area was in the path of industrial or residential development in the not-so-distant future. In their view, these unproductive vineyards represented a sound investment opportunity; such land could be purchased at reasonable prices, held for several years, and then sold at appreciated prices for industrial or residential purposes.

In time, the Deckers became involved in syndicating investments in real estate in the Ontario-San Bernardino area through limited partnerships. By 1971, the Deckers, through OLR and OCC, had organized approximately 33 limited partnerships which had invested in real estate. In addition, they had established a standard procedure, or modus operandi, for handling such investments.

In a typical syndication handled by OLR, the Deckers, acting through OCC, located the land to be purchased and then negotiated on behalf of OCC for its purchase. It was their belief that conducting negotiations through OCC, a real estate development corporation, offered certain psychological advantages over conducting their business through OLR, a real estate investment business. Once the desired real estate had been identified, a team of experts employed by either OCC or OLR proceeded to make the necessary arrangements for OCC to purchase the land. For example, a civil engineer was hired to survey the land and to search the title to the land. A title insurance company insured title to the land. An accounting firm was retained to establish and maintain the books and records for

the new enterprise. In addition, a "banking connection" was used to set up the deeds of trust executed by OCC in connection with the purchase. One express condition of the deeds of trust was the following:

It is a specific stipulation of this Deed of Trust that the grape vines on the real property described herein are hereby considered personal property and are EXCLUDED FROM THE SECURITY GIVEN HEREON; further that the Trustor herein has a right to remove, destroy or relocate any and all said vines.

Finally, an escrow agent was used to handle the actual purchase. Each member of the team was paid a fee for his services.

At or around the same time, OLR issued a prospectus for the limited partnership. In the typical prospectus, the purchase of the real estate by the limited partnership was described as "an outstanding opportunity for investment." Also, it was "the general intention of the partnership to hold the property for approximately three to five years unless previously resold at a profit." The factors which the prospectus emphasized to promote investment all pointed to the resale of the land in the future for industrial or residential purposes. In addition, the Deckers prepared a limited partnership agreement.

At the time OLR and OCC performed most of these services, the particular limited partnership to which the land would be ultimately transferred was not yet organized. OCC in effect acted as a nominee for parties to be named later.

OCC purchased the land on varying terms. Generally, a small downpayment was required. In addition, OCC executed a deed of trust with respect to the remainder of the purchase price. Subsequently, OCC resold the real estate to a limited partnership for exactly the amount it had paid for it. The limited partnership assumed the deed of trust and executed a promissory note. In addition, OLR was paid a "general partner fee" which varied with the cost of the real estate. The attorney retained by OCC and OLR was paid a separate fee, and OCC and OLR did not receive a broker's fee or other real estate commission upon the sale of the various parcels to the limited partnerships.

Generally, if the land was improved by grapevines, OLR attempted to negotiate a lease with a local vineyard operator. In a typical lease, the partnership received a percentage of gross receipts from grape sales, and the lessee incurred and paid all of the expenses of maintaining the vines. However, OLR was not

always successful in leasing all of its syndicated properties which were improved by grapevines. The partnerships were obligated to pay the real property taxes.

The partnerships involved in this case are typical of the land syndications organized by OLR. Each was organized toward the end of the petitioner's taxable year. Summarized below is information regarding the date the partnerships were formed and the date OCC transferred the real estate to them:

| Partnership | Date formed | Date land transferred |
|---|---|---|
| Devore | 12/20/71 | 12/28/71 |
| Redwood | 12/29/71 | 12/31/71 |
| Rochester Seventh | 12/26/72 | 12/29/72 |
| Rochester Eighth | 12/26/72 | 12/29/72 |
| Sultana | 11/13/72 | 11/17/72 |

For each of the partnerships, William Decker allocated the purchase price between the land and the vines based on general observations; he had no established criteria for making such allocations. A "general partner fee" was charged the partnerships by the general partner equal to approximately 10 percent of the sum of the purchase price of the land and such fee (10-percent fee). Summarized below is the acreage, purchase price, allocation of the purchase price to land and vines, and the 10-percent fee for each of the partnerships:

| Partnership | Acreage | Total purchase price | Allocation To land | To vines | 10% fee |
|---|---|---|---|---|---|
| Devore | 9.6 | $76,800 | $22,512 | $54,288 | $8,888.89 |
| Redwood | 52.0 | 205,000 | 74,500 | 130,500 | 22,778.00 |
| Rochester Seventh | 9.6 | 96,000 | 71,000 | 25,000 | 10,666.00 |
| Rochester Eighth | 9.6 | 96,000 | 71,000 | 25,000 | 10,666.00 |
| Sultana | 20.0 | 85,000 | 60,000 | 25,000 | 9,444.00 |

The downpayment paid by the partnerships varied between 2 and 10 percent of the purchase prices. Each partnership also agreed to pay to the general partner a yearly management fee of 1 percent of "the original purchase price."

The partnerships met with varying degrees of success in their efforts to lease the vineyards. The grape production on Devore and Redwood was insufficient to produce a profit, and therefore, those vineyards could not be leased. The maintenance of those

vineyards varied with the availability of funds, though many of the vines were living at the time of trial.

The grape production on Rochester Seventh and Rochester Eighth was sufficient by 1974 to lease the properties. While these vineyards have been maintained adequately since 1974, they produced no income for the limited partnerships prior to 1974, and thereafter, any such income to the partnerships was de minimis.

The Sultana vineyards did not generate any income, but they also did not generate any expenses for the partnership; the partnership agreed with a local vineyard operator that he could have the grapes if he would maintain the vines.

The partnerships were not concerned, however, with the inability of the vineyards to generate current income, because they did not purchase the properties for that purpose. With respect to the vines, the partnerships were merely concerned with keeping them alive. Most of the vines involved herein were planted around the turn of the century.

At about the same time as the Deckers became involved in real estate syndications, they also became interested in whether grapevines could be transplanted. They were fully aware of the fact that the thousands of acres of new vineyards in northern California were uniformly established by planting slips. A "slip" is a joint cut from a mature vine, which is permitted to sprout in a nursery and is then transplanted; it generally requires 5 years for a slip to become a mature vine. In addition, they knew that transplanting mature vines was unheard of in the wine industry. It was uncertain whether grapevines could be successfully transplanted because of their tap roots, which extended vertically into the ground for several feet. It was equally unclear whether a transplant program was economically feasible, whether the equipment to successfully carry out a major transplant program existed, and what would be the mechanics or logistics of such a program. Yet, they believed that if a transplant program could be conducted successfully, new vineyards could be established much more quickly than by the planting of slips.

After awhile, the Deckers contacted viticulturists and ranchers to get their views on the matter. Then, they conducted time and labor studies, the results of which they converted into pro forma costs. From an economic standpoint, they considered each varietal available for transplantation to be of equal economic

value because they believed that the price and productivity of the various varietals were inversely related. They also decided to transplant the vines only when they were dormant, which occurred from around September to March each year. The vines were to be transplanted bare-rooted, i.e., completely removed from the soil. All of the vines would be transplanted from vineyards in the Ontario, Calif., area to northern California.

In February 1972, the Deckers transplanted 65 vines in a single row on land they had rented for that specific purpose in northern California. However, these vines did not fare very well. Many of them were damaged, though it was not clear whether a frost subsequent to the transplant, or the transplant itself, caused the damage. The cost of the transplant far exceeded the Deckers' estimates. In February 1973, the Deckers extended the row by transplanting an additional 40 vines.

In February 1974, the Deckers used the knowledge acquired from the earlier two transplants to transplant 4 acres of vines in the Fresno, Calif., area. During their first year, the vines produced approximately the same quantity of grapes as they produced in the Ontario area, which was 2 to 4 tons per acre. However, in the second year, they produced 6 to 8 tons of grapes per acre. These grapes were never harvested commercially. Again, the actual cost of the operation exceeded the estimates.

In late 1974 and early 1975, the boom in the wine industry ended. Though demand for wine continued strong, the supply of grapes far exceeded the available crushing capacity, so the price of grapes declined. As a consequence, there was no longer a need for additional vineyards. In view of the economic conditions, OLR postponed further experimentation with and consideration of its transplant program.

On their Federal returns for the years at issue, the partnerships deducted the 10-percent fee and claimed depreciation and an investment credit on the value of the vines as determined by the Deckers. Two of the partnerships also claimed additional first-year depreciation on such vines. In his Federal income tax returns for the years at issue, the petitioner reported his distributive share of the partnerships' income and losses. After an audit of the partnership returns, the Commissioner determined that the value of the vines should be reduced, resulting in a reduction in the allowable depreciation and investment credit, and that the 10-percent fee was not deductible. In the notice of

deficiency issued to the petitioner, the Commissioner made corresponding adjustments in the petitioner's distributive shares of partnership income and losses.

For purposes of the notice of deficiency, the Commissioner determined that the grapevines had the following values:

| Partnership | Value |
| --- | --- |
| Devore | 0 |
| Redwood | $16,637 |
| Rochester Seventh | 0 |
| Rochester Eighth | 0 |
| Sultana | 9,534 |

At the trial, the Commissioner presented the testimony of an expert witness who concluded that some of the vines had a different value than that determined by the Commissioner in his deficiency notice. Accordingly, the Commissioner adopted the values found by his expert and now maintains that the grapevines had the following values:

| Partnership | Value |
| --- | --- |
| Devore | $2,130 |
| Redwood | 11,085 |
| Rochester Seventh | 2,130 |
| Rochester Eighth | 2,130 |
| Sultana | 4,610 |

## OPINION

The first issue for decision is whether guaranteed payments under section 707(c) from the partnerships to OLR are currently deductible by the partnerships without regard to the requirements of sections 162 and 263.

Section 707(c) provides:

SEC. 707(c). GUARANTEED PAYMENTS.—To the extent determined without regard to the income of the partnership, payments to a partner for services or the use of capital shall be considered as made to one who is not a member of the partnership, but only for the purposes of section 61(a) (relating to gross income) and section 162(a) (relating to trade or business expenses).

The petitioner argues that the payments at issue are guaranteed payments under section 707(c) and, as such, are *automatically* deductible by the partnerships irrespective of whether they are capital expenditures under section 263. The parties agree that

the fee is a guaranteed payment within the meaning of section 707(c), but it does not follow that such payment is automatically deductible.

In *Cagle v. Commissioner*, 63 T.C. 86 (1974), affd. 539 F.2d 409 (5th Cir. 1976), the same issue was squarely presented to and decided by this Court. After reviewing the legislative history of section 707(c), the Court observed that the pre–1954 treatment of transactions between partners and partnerships was confused and that to eliminate such confusion, Congress decided to employ in the 1954 Code the entity, rather than the aggregate, approach to such transactions. (63 T.C. at 93–94.) We further stated at pages 94–95:

> Section 707(c) states that for the purposes of sections 61(a) and 162(a) only shall payments to a partner for services, to the extent determined without regard to the income of the partnership, be considered as made to one who is not a member of the partnership. Clearly section 707(c) itself does not require that any guaranteed payment be automatically deductible under section 162(a). Rather, its import is that such a payment for services *may* qualify as a section 162(a) expense of the partnership since the entity theory of partnerships is employed therein to allow that result * * *
>
> If we were to allow a section 162(a) deduction in the case of a partner's rendering services to his partnership which are capital in nature, it would be the only instance that such a deduction would be allowed for a capital expenditure. We see no reason why employment of the entity theory of partnerships in this facet of partnership taxation should require the automatic deductibility of guaranteed payments and hence make such a holding an anomaly in tax law as far as capital expenditures are concerned. * * *
>
> [Emphasis in original.]

Our decision in *Cagle* was appealed to, and affirmed by, the Court of Appeals for the Fifth Circuit.

Since *Cagle*, there has been no change in the law which would support a different result. To the contrary, section 707(c) was amended by section 213(b)(3) of the Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1547, to clarify that guaranteed payments under section 707(c) must meet the requirements under both sections 162 and 263. In the committee reports accompanying the bill which eventually became the Tax Reform Act of 1976, our decision in *Cagle* was expressly approved and endorsed by the House Ways and Means Committee and the Senate Finance Committee, both as a statement of what the law was prior to 1976, and as a statement of what the law should be. S. Rept. 94–938 (1976), 1976–3 C.B. (Vol. 3) 49, 130–132; H. Rept. 94–658 (1976), 1976–3 C.B. (Vol. 2) 695, 812–814.

After carefully considering the petitioner's arguments, we conclude that they are merely repetitious of those raised, fully considered, and rejected by us and the Fifth Circuit in *Cagle*. A reading of the legislative history of section 707(c) shows clearly that Congress was concerned with the question of whether to adopt the entity or aggregate approach to the treatment of partnerships for purposes of determining how to treat a guaranteed payment. In that legislative history, Congress made clear that it was adopting the entity approach and pointed out the consequences of that approach, including the fact that the payment would be deductible by the partnership if it constituted a business expense. There is absolutely no indication that Congress intended to depart from the well established distinction between ordinary and necessary business expenses and capital expenditures, and we are altogether confident that if Congress had wished to make capital expenditures deductible, it would have done so clearly. Accordingly, we conclude that *Cagle* was correctly decided, and we shall adhere to and follow our holding in that case.

Next, we must decide whether the 10-percent fees are currently deductible or are capital expenditures. The petitioner argues the fees are ordinary and necessary business expenses and therefore deductible, whereas the Commissioner argues the fees were incurred in connection with organizing and syndicating the partnerships and therefore are capital expenditures.

Section 162 generally allows deductions for ordinary and necessary business expenses. Under section 263, capital expenditures are not deductible. Though the line separating ordinary business expenses from capital expenditures is not always clearly marked, it is generally true that the term "business expense" includes only those expenditures which are a part of the current cost of operating the business. "When, however, an expenditure is made for the acquisition of an asset the useful life of which will extend beyond the year in which cost is incurred, such expenditure is considered as a capital item, and is not generally deductible as a business expense." (*Cagle v. Commissioner*, 539 F.2d at 415.) Sec. 1.263(a)–1 and 2, Income Tax Regs.

Expenditures incurred in connection with the organization and syndication of limited partnerships are capital in nature and, therefore, not currently deductible. *Cagle v. Commissioner*,

*supra; Meldrum & Fewsmith, Inc. v. Commissioner*, 20 T.C. 790, 807 (1953), affd. 230 F.2d 283 (6th Cir. 1956).[2] As part of the Tax Reform Act of 1976, section 709 was enacted to deal with such fees. Section 709(a) expressly provides that syndication fees are not deductible and that, except as provided by section 709(b), organization fees are not deductible. Section 709(b) allows a partnership to elect to amortize and deduct over a period of not less than 60 months its capital expenditures incurred in organizing the partnership. S. Rept. 94-938, *supra;* H. Rept. 94-658, *supra.* Such provision parallels the election available to corporations under section 248. However, section 709(b) applies only to organization fees paid or incurred in taxable years beginning after December 31, 1976. Tax Reform Act of 1976, Pub. L. 94-455, sec. 213(f)(3), 90 Stat. 1549.

In deciding whether the 10-percent fees are ordinary and necessary business expenses or capital expenditures, we must look to the nature of the services performed by OLR. The petitioner bears the burden of proving the fees are currently deductible (Rule 142(a), Tax Court Rules of Practice and Procedure; *Welch v. Helvering*, 290 U.S. 111 (1933)), and he has failed to carry such burden.

The evidence presented by the petitioner is wholly unconvincing. He summarizes the services performed by OLR as:

the assumption by the General Partners of the responsibility to each limited partner in connection with his investment and for the establishment of operating procedures related thereto, including collection of rents from leases of vines, collection from partners of contributions, deposit in bank accounts and payments of obligations, supervision of the bookkeeping functions once initially established by the accountants and thereafter fulfilled by the issuance of annual reports and tax returns.

However, the fees at issue ranged from $8,888.89 to $22,778, and it is very unlikely that they were paid for such minor administrative services, especially since a management fee of 1 percent of the purchase price was deemed sufficient for such services in subsequent years.[3] The petitioner attempts to explain the size of the 10-percent fee by arguing that, during the first year, OLR performed substantial other services in addition to those performed in connection with organizing and syndicating the

---

[2] See also *Wolkowitz v. Commissioner*, a Memorandum Opinion of this Court entered Aug. 25, 1949.

[3] From the partnership agreement, it is not clear whether the management fee was also due for the first year.

partnerships, and that such other services exceeded those in subsequent years. Yet, the evidence does not reasonably support such position, especially since all of the partnerships were organized toward the end of the petitioner's taxable year, and the 10-percent fee was 10 times the management fee paid in subsequent years. Finally, the evidence presented by the petitioner is singularly vague regarding exactly what services were performed by OLR.

On the other hand, the evidence strongly suggests that, in fact, the 10-percent fees were paid to OLR for organizing and syndicating the partnerships. OCC and OLR performed substantial services in connection with the organization and syndication of the partnerships. OCC located and inspected the land. It also searched the title, conducted the negotiations, and ultimately purchased the land. At the same time, OLR was advertising, circulating prospectuses, paying large fees and commissions, and incurring other expenses promoting the investment and locating potential investors. In addition, OLR prepared the partnership agreements, and OCC handled the escrow accounts and the deeds of trust. Most of these services were performed before the partnerships were organized, and OCC and OLR received no fees or commissions for their services other than the 10-percent fees. Under these circumstances, we must conclude that the 10-percent fees were costs of organization and syndication, and as such, they must be capitalized.[4]

The next issue for decision is whether the grapevines are "tangible personal property" within the meaning of section 179(d) so that the partnerships are entitled to elect additional first-year depreciation with respect to such vines. Section 179(a) provides, in general, that in the case of section 179 property, a "reasonable allowance" for depreciation within the meaning of section 167(a) includes, at the election of the taxpayer, an allowance of 20 percent of the cost of the property in the first

---

[4]The petitioner also argued that such fees are deductible under sec. 212. However, sec. 212 does not enlarge the range of allowable deductions vis-a-vis sec. 263, but "merely enlarged the category of incomes with reference to which expenses were deductible." *McDonald v. Commissioner*, 323 U.S. 57, 62 (1944); *Kroll v. Commissioner*, 49 T.C. 557, 561 (1968). Thus, to be deductible, under sec. 212, an expense must be ordinary and necessary. Since we have concluded that the expenditures are capital in nature, they are not deductible under sec. 212, and therefore, we do not reach the question of whether a guaranteed payment by a partnership within the meaning of sec. 707(c) is deductible if it satisfies the requirements of sec. 212.

taxable year for which depreciation is allowable with respect to such property.

The term "section 179 property" is defined in section 179(d)(1), which provides:

(1) SECTION 179 PROPERTY.—For purposes of this section, the term "section 179 property" means tangible personal property—
> (A) of a character subject to the allowance for depreciation under section 167,
> (B) acquired by purchase after December 31, 1957, for use in a trade or business or for holding for production of income, and
> (C) with a useful life (determined at the time of such acquisition) of 6 years or more.

Section 1.179–3(b), Income Tax Regs., defines tangible personal property as follows:

(b) *Tangible personal property.* Local law definitions will not be controlling for purposes of determining the meaning of the term "tangible personal property" as it is used in section 179 and the regulations thereunder. *For purposes of section 179, the term "tangible personal property" includes any tangible property except land, and improvements thereto, such as buildings or other inherently permanent structures thereon* (including items which are structural components of such buildings or structures). Assets accessory to the operation of a business, such as machinery, printing presses, transportation or office equipment, refrigerators, individual air conditioning units, grocery counters, etc., generally constitute tangible personal property for purposes of section 179, even though such assets may be termed fixtures under local law. The term does not include, for example, the wiring in a building, plumbing systems, nor central heating or central air conditioning machinery, pipes, or ducts or other items, which are structural components of a building or other permanent structure, nor does the term include trademarks, goodwill, or other intangibles. [Emphasis supplied.]

Property can qualify for the investment credit if it constitutes tangible personal property or, subject to certain limitations, other tangible property. In *LaCroix v. Commissioner*, 61 T.C. 471, 485 (1974), we concluded that the definitions of tangible personal property for purposes of sections 48 and 179 and the regulations thereunder are substantially identical and that therefore "the two terms should be applied in a similar manner."

Under State law, affixation to the land is generally a basis for distinguishing personal property from other property. Similarly, under State law, an agreement by the parties may, under certain circumstances, convert real property to personal property. See, e.g., Cal. Civ. Code sec. 658 (West 1970). However, such bases are not to be relied upon exclusively in determining, for Federal tax

purposes, whether property is tangible personal property: affixation to the land does not, per se, exclude property from the category of tangible personal property, and an agreement of the parties should not conclusively change the character of otherwise real property to tangible personal property. *Whiteco Industries, Inc. v. Commissioner,* 65 T.C. 664, 671–672 (1975); *LaCroix v. Commissioner, supra* at 488. In deciding whether property is to be classified as tangible personal property, the courts have developed several criteria to be considered:

(1) Is the property capable of being moved, and has it in fact been moved?

(2) Is the property designed or constructed to remain permanently in place?

(3) Are there circumstances which tend to show the expected or intended length of affixation, i.e., are there circumstances which show that the property may or will have to be moved?

(4) How substantial a job is removal of the property, and how time-consuming is it? Is it "readily removable"?

(5) How much damage will the property sustain upon its removal?

(6) What is the manner of affixation of the property to the land?

*Whiteco Industries, Inc. v. Commissioner,* 65 T.C. at 672–673, and the cases cited therein.

Applying these criteria to the facts in our case leads to the conclusion that the grapevines are an "inherently permanent structure" within the meaning of section 1.179–3(b), Income Tax Regs., and therefore, the grapevines are not tangible personal property. Most of the vines involved in this case were planted at or around the turn of the century, and none of these vines has been moved since then—the vines involved in the various transplant programs were not from the vineyards owned by partnerships in this case. Moreover, the vines, having been attached to the land for over half a century, developed an intricate root system, including a long taproot which extended vertically into the ground for several feet. It not only required a major production to extricate the vines from the ground, but the root system obviously was disrupted by such process. Though the petitioner argues vigorously that the transplant program was viable, only an insubstantial number of vines have been

transplanted. These vines were transplanted primarily for experimental purposes, and after they had served their purpose, they were abandoned by OLR.

Our conclusion is supported by *LaCroix v. Commissioner, supra,* and *Powers v. United States,* 285 F. Supp. 72 (C.D. Cal. 1968). In those cases, the courts were called upon to decide whether citrus trees were tangible personal property under section 179. After analyzing the manner and permanence of affixation to the land, both courts held that the citrus trees were not tangible personal property. In *LaCroix v. Commissioner,* 61 T.C. at 488, we concluded:

> Because we believe that commonsense dictates that citrus trees or trees in general are more commonly associated with land and because of their inherently permanent nature it is our judgment that citrus trees cannot reasonably be regarded as items of personal property for the purposes of section 179.

It appears that the grapevines are essentially similar to citrus trees in their attachment to the land. Though there are some slight differences between grapevines and citrus trees, such differences are not of sufficient magnitude to warrant a different conclusion in this respect.[5] The petitioner attempts to distinguish the citrus tree cases by arguing that there was an agreement to remove the grapevines from the land. However, at the times the vineyards were acquired, there was nothing more than a hope that grapevines could be transplanted successfully. Even now, the only transplant programs that have occurred were on a small scale and were more in the nature of experiments; it has not been shown that a widespread program of transplanting grapevines can be carried on successfully. Thus, we are not convinced that when the vineyards were acquired, there was a bona fide plan to sever the grapevines from the land and sell them separately.

Finally, we must determine the fair market value of the grapevines so the partnerships can determine the depreciation deductions and investment credits to which they are entitled. By now, it is generally accepted that the price at which a willing buyer will purchase property from a willing seller, when neither

---

[5]In Rev. Rul. 67–51, 1967–1 C.B. 68, the Commissioner ruled that citrus trees are not tangible personal property for purposes of sec. 179, but that they qualify for the investment credit as "other tangible property" under sec. 48. Here, the Commissioner concedes that the grapevines qualify for the investment credit.

party is acting under compulsion and both parties are fully informed of all the relevant facts and circumstances, establishes fair market value. *Bankers Trust Co. v. United States,* 207 Ct. Cl. 422, 518 F.2d 1210, 1219 (1975), cert. denied 424 U.S. 966 (1976); *McShain v. Commissioner,* 71 T.C. 998 (1979); *Staley v. Commissioner,* 41 B.T.A. 752 (1940). To establish the fair market value of the vines, both parties presented the testimony of expert witnesses.

The Commissioner's expert is a highly qualified real estate appraiser. He first became an appraiser in 1960, and since then, he has had extensive experience in valuing real estate in and around the Ontario-San Bernardino, Calif., area. He has valued farmland on many occasions, and he has valued land improved by grapevines in the Ontario-San Bernardino area. He is a member of the American Society of Farm Managers and Rural Appraisers and the California Society of Farm Managers and Rural Appraisers. He is designated an Accredited Rural Appraiser.

Before valuing the grapevines, he personally inspected the vineyards owned by the partnerships. He analyzed the production of vineyards in the area and determined that environmental influences had drastically reduced the production of vineyards in the Ontario-San Bernardino area. He ascertained the number of harvested acres of vineyards in San Bernardino County, the tons of grapes per acre, and the average price per ton for a 3-year period from 1970 to 1972. Using such information, he obtained the income which the vines could be expected to produce, and he computed the fair market value of the vines based on such projected income. Then, he examined at least 11 other sales involving comparable agricultural or farmland in the vicinity of the land in issue. In such sales, he ascertained the prices paid for the land and any amounts allocated to the purchase of producing vineyards. In addition, he carefully scrutinized the terms of each of the comparable sales. Because the downpayment required of each of the partnerships ranged between 2 and 10 percent, and because of other terms favorable to the partnerships, he determined the prices paid by them exceeded the fair market value of the land. In reaching his valuations, he considered what

effect, if any, the possibility of transplanting the vines would have on value and concluded as follows:[6]

Consideration was given to the economic feasibility of possible vine removal for replanting on more agriculturally oriented land. However, inquiry and experience suggests that any such scheme to replant a mature vineyard does not appear to have merit or economic feasibility and is fraught with hazard.

The petitioner's expert is a land developer. At the time of the trial, he had developed over 10,000 acres of vineyards in California. In computing the fair market value of the vines, he analyzed the California wine industry and found that, economically speaking, the industry appeared to have a promising future in the early 1970's. He assumed that the transplantation of vines was a viable method of establishing a vineyard. In determining the best use for the vines, he concluded as follows:

Since * * * [OLR] has established the transplantable potential of mature vines in their transplant program and since there is strong demand for the development of vineyards in high yield areas, the value of the vines as a transplantable asset must be considered, and is, therefore, the primary use treated in this report.

Using three different valuation approaches, he then proceeded to compute the value of the vines. Under the capitalization of income approach, he used the yields per acre, and prices paid for grapes, in the Modesto and San Joaquin areas of California, to compute the gross revenue. From such revenue, he subtracted the cost of maintaining the vines and capitalized the remainder using a capitalization rate of 10. Finally, he subtracted the cost of transplanting the vines to reach a fair market value of $7,434.44 per acre for the vines. Under the cost approach, he computed the cost of developing 1 acre of a new vineyard using conventional methods, and from such figure, he eliminated costs which would be avoided by transplanting vines, resulting in a vine value of $3,454 per acre. Under the court-award approach, he determined the value of the vines by reference to value placed on certain vines by a court of the State of

---

[6]At the trial, the petitioner objected to the admission in evidence of a portion of the report of the Commissioner's expert. In the petitioner's view, a letter in such report written by a viticulturist expressing the opinion that vines could not be successfully transplanted was inadmissible hearsay. However, under rule 801(c), Federal Rules of Evidence, the statement is not hearsay because it was not admitted to prove the truth of the matter asserted; rather, it was offered merely to show the information relied upon by the Commissioner's expert in reaching his conclusion. We relied on the opinion of the Commissioner's expert, and not such letter, in reaching our conclusion. In any event, the petitioner has apparently abandoned his objection on brief.

California. Under such approach, he valued the vines at $7,187.70 per acre. Combining these three approaches, he concluded that the vines were worth $6,000 per acre on the relevant valuation date.

In our judgment, the valuation of the petitioner's expert and of the Deckers is based on an unsound assumption. Both the income and cost approaches and the Deckers' original allocations are premised on the assumption that the possibility of transplanting the vines dramatically affected their value. It is true that future events which can be anticipated with reasonable certainty at the valuation date may be considered in arriving at fair market value (see, e.g., *Gray v. Commissioner*, 2 B.T.A. 672, 682 (1925)), but the prospect that vineyards could be developed by transplantation was not reasonably foreseeable. In fact, no one in the industry was developing commercial vineyards by transplantation. In the early 1970's, it had not been established that such technique was viable agriculturally, logistically, or economically. The Deckers' transplant projects were clearly in the nature of experiments to determine if, and to what extent, transplantation of vines was a viable alternative to the conventional methods of developing vineyards. Moreover, when the experimental vines had served their purpose, OLR abandoned them. At no time has there been any demand for mature vines for transplanting purposes. To the contrary, when vineyards were being converted to other uses in southern California, thousands of vines were being uprooted and burned as waste. In fact, the petitioner's expert refused to use the Deckers' transplanting technique in the early 1970's when they approached him about the possibility. In addition, the facts as they subsequently developed confirm our conclusion that there was no reasonable prospect of transplanting the vines in the early 1970's; at the time of trial, there was still no demand for vines for transplanting. Finally, according to the petitioner's expert and the Deckers, the vines were worth between approximately 30 to 70 percent of the total purchase price; yet, after the payment of the downpayment, which never exceeded 10 percent of the purchase price of the land, the sellers of the land were willing to release the vines from the collateral securing payment of the remaining purchase price.

The court-award approach employed by the petitioner's expert is equally unconvincing. We know nothing about the facts and

circumstances in that case. For example, we do not know the varietal of vines involved, where they were located, whether punitive damages were involved, and when the vines were damaged. We were not provided a citation to the case, and we could not otherwise locate it. Without a good deal more information about the vines involved in that case, we can place no weight on the value based thereon.

On the other hand, the analysis of the Commissioner's expert is very persuasive. In general, his valuation report was a thorough and comprehensive analysis of the factors influencing the fair market value of the land and vines. The petitioner's only objection to the analysis of the Commissioner's expert is that such expert failed to take into consideration the possibility of transplanting the vines, but for the reasons that we have already set forth, we are entirely satisfied with his conclusion on this matter.

In one respect, however, we disagree with the conclusions of the Commissioner's expert. Such expert concluded that the prices paid by the partnerships for the properties exceeded their fair market values, and he allocated between the land, vines, and other improvements only the amounts which he considered to represent the total fair market value of the property. Yet, for purposes of determining allowable depreciation and investment credit, we must consider the prices actually paid for the properties. Accordingly, we hold that the fair market value of the vines must be determined by allocating the price actually paid for each property between the land, vines, and other improvements in the same proportion as did the Commissioner's expert. Cf. sec. 1.167(a)–5, Income Tax Regs.

*Decision will be entered under Rule 155.*