LAURENCE A. AND JANET C. DUAINE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Duaine v. Commissioner
Docket No. 12330-82.
United States Tax Court
T.C. Memo 1985-39; 1985 Tax Ct. Memo LEXIS 592; 49 T.C.M. (CCH) 588; T.C.M. (RIA) 85039; January 24, 1985
Steven R. Wolfson and Joy C. Al-Sofi, for the petitioners. Douglas R. Fortney, for the respondent. GOFFE
*588 MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined a deficiency in petitioners' Federal income tax for the taxable year 1978 in the amount of $5,194. After concessions by the parties, the issues for decision are whether various *594 components of a restaurant *2 building leased by petitioners to Taco Bell qualify for investment tax credit and additional first-year depreciation pursuant to sections 38 and 179, [1] respectively. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and accompanying exhibits are so found and incorporated herein by reference. Petitioners, husband and wife during the year in issue, resided in Irving, Texas, when they filed their petition. Petitioners timely filed a joint Federal income tax return for the taxable year 1978 with the Internal Revenue Service Center in Austin, Texas. [2]
During the taxable year 1978, petitioner was employed as a pilot by Braniff Airways, Inc. Petitioner also developed *595 real property in conjunction with Duaine Development Corporation (hereinafter referred to as "the corporation"). The corporation, which was organized under the laws of Texas, was incorporated on June 25, 1965. At all times pertinent hereto, petitioner was the sole shareholder of the corporation. *3 According to its Articles of Incorporation, the corporation was formed to construct, build, improve, own, manage, operate, lease, purchase, sell and subdivide real property. During the taxable years 1972 through 1977, the corporation engaged in extensive real property development activity. In September 1975, the corporation acquired several contiguous tracts of real property in Irving, Texas. In an agreement dated September 13, 1977, petitioner, individually, leased a building to be constructed on the Irving, Texas, real property to Taco Bell, a California corporation. Under the terms of the lease, Taco Bell agreed to use the building as a Taco Bell restaurant for 20 years. In an agreement dated October 5, 1977, petitioner, individually, contracted with J-Four, Inc., a builder, for the construction of a restaurant satisfying Taco Bell's specifications. On November 2, 1977, petitioner, *596 individually, applied for $150,000 of permanent consturction financing from a mutual life insurance company. By month's end, the life insurance company and petitioner had agreed to lend petitioner, individually, the requested sum. In December 1977, the corporation obtained $150,000 of interim construction financing from a local bank. Although petitioner, individually, had applied for such financing, the bank refused to lend him the money due to local usury law considerations and insisted that the loan be made to a *4 corporation. In conjunction with the corporation's execution of the note for the interim construction financing, petitioner personally guaranteed the loan on behalf of the corporation. On May 8, 1978, in one simultaneous transaction, the interim lender was paid by the corporation and the corporation conveyed the land that the Taco Bell restaurant had been built on to petitioner, subject to a first mortgage lien to the mutual life insurance company. The restaurant building constructed for lease to Taco Bell was built according to its specifications and resembled other similar franchises. Like many other fast food establishments, the restaurant's interior *597 contained extensive tiling throughout the food preparation, refrigeration, storage and loading areas. In these areas, the tiling completely covered the floors and walls. The tile design was chosen to facilitate cleaning. These tiles were glued to the building's interior surfaces. Behind the counter, the restaurant's tiled floor gently sloped towards numerous drains. As the floor tiles were glued to the underlying concrete slab which provided the primary support for the entire building, portions of the restaurant's concrete foundation slab also sloped towards these drains. Around the entire perimeter of the food preparation and storage areas, the concrete foundation slab was also raised about six inches, forming a tiled shelf which projected about 18 inches from the wall. The design rationale for these portions of the concrete *5 foundation slab was to facilitate cleaning with the sloped drainage basins while providing raised storage areas for food handling equipment. Behind the counter, the restaurant building also contained several electrical outlets and attendant conduits extending back to the circuit box. These outlets provided localized power sources for the lessee's *598 kitchen equipment. Under the terms of the lease with Taco Bell, although petitioner did not provide any of the restaurant's food preparation, storage or display items, he was required to provide the necessary connectors between the lessee's equipment and the utility "stub-outs," i.e., incoming utility mains (piping) protruding several inches from the restaurant's interior walls and floor. Thus, the restaurant building included the following items: (1) separate water lines from the incoming water main to the lessee's steam trays, cooking vessels and ice machines; (2) gas lines from the building's main gas line to the restaurant's cooking elements; (3) several connecting fixtures to miscellaneous appliances of the lessee; and (4) special drain lines from the lessee's refrigerators and sinks to the drains. In many instances, copper plumbing fixtures were required instead of less costly polyvinyl chloride connectors. The restaurant building also incorporated numerous interior and exterior ornamental lighting fixtures. All of these fixtures were made of hammered black iron and amber glass and matched the Taco Bell motif. The interior lights hung over the restaurant's *6 customer *599 tables and were the primary lighting source in this area. There also were about a dozen of these Taco Bell design theme light fixtures hanging from the restaurant's outdoor perimeter along the building's walkways. These lights provided most of the artificial illumination for these walkways. For the taxable year 1978, petitioners claimed investment tax credit and additional first-year depreciation pursuant to sections 38 and 179, respectively, for the following components of the restaurant building leased to Taco Bell: (1) all of the concrete foundation slab behind the counter; (2) all of the floor and wall tile; (3) plumbing and gas fixtures connecting the lessee's equipment to the utility "stub-outs"; (4) electrical outlets and conduits extending back to the circuit box which provided localized power sources for the lessee's equipment; and (5) interior and exterior ornamental lighting fixtures. Petitioners determined the portion of the entire restaurant's concrete foundation slab for which they claimed additional first-year depreciation and investment tax credit by assigning a unit cost per square foot to the area behind the counter. Petitioners claimed deductions and credit for *600 only those portions of the plumbing and gas fixtures which connected the lessee's equipment to the utility "stub-outs." They did not claim credit or deductions for any utility fixtures located within the walls, floor or ceiling. Petitioners also claimed additional first-year depreciation and investment tax credit only with respect to the interior and exterior ornamental lighting fixtures. They did not *7 claim any deduction or credit with respect to the building's standard lighting system. The costs shown on petitioners' Federal income tax return for the taxable year 1978 with respect to these components were as follows: Item
Cost
Slab
$5,812
Tile
12,685
Plumbing Fixtures
8,064
Electrical Fixtures
8,064
Interior and Exterior Lamps
1,068
In a timely notice of deficiency, the Commissioner disallowed the investment tax credit which petitioners claimed with respect to the Taco Bell components on the bases that, as noncorporate lessors, "(1) [they] did not manufacture or produce the property in [their] ordinary course of business and (2) the term of the lease exceeds 50 percent of the useful life of the property and [their] deductions by reason *601 of the Internal Revenue Code Section 162 with respect to the property are less than 15 percent of the income from the property." The Commissioner also disallowed additional first-year depreciation with respect to the components in issue because petitioners' "acquisition of the property was not a purchase within the meaning of Internal Revenue Code Section 179(d)(2) since it was acquired from a related party." However, in respondent's Reply Brief, he *8 acknowledged that petitioners satisfied the applicable tests with respect to the investment tax credit disallowances set forth in the notice of deficiency. In his opening statement at trial, respondent announced that another basis for sustaining his determinations that petitioners were not entitled to investment tax credit and additional first-year depreciation with respect to the Taco Bell components in issue was that such components did not constitute "tangible personal property" within the purview of section 48(a)(1)(A). Respondent's initial post-trial brief also contends that the components in issue do not constitute "other tangible property" for section 48(a)(1)(B) purposes. *602 OPINION The issues for decision are whether various components of a restaurant building leased by petitioners to Taco Bell qualify for additional first-year depreciation and investment tax credit pursuant to sections 179 and 38, respectively. Issue 1. Additional First-Year Depreciation
With respect to the additional first-year depreciation issue, the Commissioner determined that petitioners' acquisition of the property for which they claimed additional first-year depreciation did not constitute a "purchase" for section 179(d)(2) purposes "since it was acquired from a related party," i.e., the corporation. The Commissioner's determination is *9 presumptively correct, Welch v. Helvering,290 U.S. 111, 115 (1933), and petitioners bear the burden of proving it to be erroneous. Rule 142(a). Petitioners deny that they acquired the restaurant building containing the additional first-year depreciation items from the corporation and instead contend that they always owned the restaurant building. According to petitioners, the corporation was only tangentially involved with the building by virtue of its ownership of the underlying real property and *603 role in securing interim construction financing. Further, petitioners assert that the corporation was utilized in their search for interim financing "soley [sic] in order to allay certain apprehensions concerning the then current interpretation of state usury laws." Finally, petitioners state that the fact that the underlying real property, which was originally owned by the corporation, was not deeded to petitioners prior to the restaurant building's completion was for the convenience of petitioners' title attorney and has no bearing on the resolution of this matter. Respondent's position is that petitioners' acquisition of the building containing the additional first-year depreciation items does not constitute a "purchase" within the purview of section 179(d)(2) because it was acquired from a related corporation. He initially observes that it was the corporation which obtained the necessary interim construction financing. He then asserts that "[t]he building was built on land owned by the corporation and thus became part of the land owned by the *10 corporation. The building and property were then transferred to the taxpayer in return for the taxpayer paying off the *604 interim loan." Finally, respondent's trial memorandum, citing Roccafortev. Commissioner,708 F.2d 986 (5th Cir. 1983), revg. 77 T.C. 263 (1981), contends that "the Fifth Circuit held that, when the corporate agent exists solely through the actions of its owner-principal, the corporation and the principal will be taxed separately. The Fifth Circuit held that as a matter of law this ownership dependency defeated the nontaxable agents." [3]
Petitioners' post-trial briefs suggest that respondent's reference to Roccaforte v. Commissioner,supra, and the corporate agent concept are irrelevant. Petitioners then assert that they have never contended that the corporation is not a separate taxable entity, rather the only issue is whether the corporation ever actually owned the restaurant building and components in issue. In resolving the issue of whether petitioner acquired the Taco Bell restaurant building from a related corporation within the purview of section *605 179(d)(2), we observe that the interim construction financing lender adamantly refused to lend the requested sum to petitioner, individually. Instead, this lender insisted upon advancing the loan to the corporation which had previously engaged in extensive real property development. According to the terms of the interim construction financing note *11 that the corporation ultimately executed, proceeds from the note were to "be used in connection with the construction of improvements to the real property" that the corporation already owned. This note does not provide that the corporation was authorized to lend the loan proceeds to petitioner, individually, nor does the record contain any evidence indicating that this scenario occurred. Another consideration in resolving who is the owner of the restaurant building pertains to the likely events following a loan default. The interim construction financing note provided that the lender would look to the corporation and its Irving, Texas, real property (including improvements constructed with the loan proceeds) should the corporation default upon its terms. Although petitioner personally guaranteed this loan on behalf of the *606 corporation, the immobility of the Irving, Texas, real property and specialized collection remedies associated with real property would make this corporate asset an attractive source for satisfaction of any judgment. [4]
*12 Although petitioners assert that the corporate agent concept is irrelevant to the instant case, the possibility that the corporation was merely acting as petitioner's agent in obtaining the interim construction financing is also not supported by the record. The corporation was not represented to third parties as petitioner's agent, Ourisman v. Commissioner,82 T.C. 171, 173-175 (1984), *607 on appeal (4th Cir., June 25, 1984), nor did the corporate entity agree in writing with the alleged principal that it was acting solely as his agent. Roccaforte v. Commissioner,supra.See also Moncrief v. United States,730 F.2d 276 (5th Cir. 1984). Further, according to an unexecuted "Earnest Money Contract," [5] the corporation was also apparently willing to convey (and may have actually conveyed if this contract was, in fact, executed) to petitioner, indivudially, the real property that the Taco Bell restaurant was built on for the following consideration: (1) extinguishment of the seller's debt to the buyer in the amount of $20,658; and (2) the property to be taken subject to a first-mortgage lien in the amount of $150,000 owed to the mutual life insurance company which ultimately provided the permanent long-term financing. *608 *13 After careful consideration of the parties' contentions in light of the record, we conclude that the corporation was the owner of the Taco Bell restaurant upon its completion. [6]
From this determination, we must now ascertain whether petitioner acquired the Taco Bell restaurant building, which contains the items in dispute, from a related party within the purview of section 179(d)(2) as respondent contends. Resolution of *609 this matter is necessary in our redetermination of the propriety of petitioners' claimed additional first-year depreciation pursuant to section 179, the pertinent portion of which provided: (d) DEFINITIONS AND SPECIAL RULES.-- (1) SECTION 179 PROPERTY.--For purposes of this section, the term "section 179 property" means tangible personal property-- (A) of a character subject to the allowance for depreciation under section 167, (B) acquired by purchase after December 31, 1957, for use in a trade or business or for holding for production of income, and (C) with a useful life (determined at the time of such acquisition) of 6 years or more. *14 (2) PURCHASE DEFINED.--For purposes of paragraph (1), the term "purchase" means any acquisition of property, but only if-- (A) the property is not acquired from a person whose relationship to the person acquiring it would result in the desallowance of losses under section 267 or 707(b) (but, in applying section 267(b) and (c) for purposes of this section, paragraph (4) of section 267(c) shall be treated as providing that the family of an individual shall include only his spouse, ancestors, and lineal descendants), *610 (B) the property is not acquired by one component member of a controlled group from another component member of the same controlled group, and (C) the basis of the property in the hands of the person acquiring it is not determined-- (i) in whole or in part by reference to the adjusted basis of such property in the hands of the person from whom acquired, or (ii) under section 1014(a) (relating to property acquired from a decedent). [Emphasis added.] When the immediate fact pattern is viewed in light of the preceding definitions and special rules, it is apparent that petitioner did not acquire the Taco Bell restaurant building and components in issue in a qualifying purchase within the purview of section 179. We have already held that the corporation was the owner of the Taco Bell restaurant building and the components in issue upon its completion. At all times pertinent hereto, petitioner was the sole stockholder of the corporation. Petitioner's acquisition of the restaurant building and components in issue, therefore, clearly constitutes a transaction within the *15 purview of section 267(b)(2); [7] hence, the components in issue do not constitute "section 179 *611 property" because they were acquired in a disqualifying transaction set forth in section 179(d)(2)(A). Accordingly, the Commissioner's disallowance of the additional first-year depreciation claimed by petitioners with respect to the components in issue is sustained as petitioners have failed to carry their burden of proving that they acquired such components in a qualifying transaction. Rule 142(a). Issue 2. Investment Tax Credit
With respect to the investment *612 tax credit issue, respondent has conceded the bases for disallowance of the credit that were set forth in the notice of deficiency. At trial, respondent *16 asserted that petitioners were still not entitled to investment tax credit concerning the components in issue because these components do not constitute "tangible personal property" within the meaning of section 48(a)(1)(A). In his post-trial briefs, respondent also contends that the components are not "other tangible property" for section 48(a)(1)(B) purposes. Petitioners contend that these components are either tangible personal property which were intended for "special use" beyond normal building requirements or other tangible property used as an integral part of manufacturing or production, [8] and hence are eligible for investment tax credit. Respondent's current contentions with respect to the disallowance of the investment tax credit constitute a new matter; therefore, he bears the burden of proving that his positions are correct. Rule 142(a). *613 Section 38 allows a credit against Federal income taxes for investment in specified property. Section 48(a)(1)(A) defines "section 38 property" so as to include depreciable "tangible *17 personal property" having a useful life of three years or more. Section 48(a)(1)(B)(i) further expands this definition to include: (B) other tangible property (not including a building and its structural components) but only if such property-- (i) is used as an integral part of manufacturing, production, or extraction or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, * * * [Emphasis added.] Section 1.48-1(c), Income Tax Regs., defines "tangible personal property" as: * * * any tangible property except land and improvements thereto, such as buildings or other inherently permanent structures (including items which are structural components of such buildings or structures). Thus, buildings, swimming pools, paved parking areas, wharves and docks, bridges, and fences are not tangible personal property. Tangible personal property includes all property (other than structural components) which is contained in or attached *614 to a building. Thus, such property as production machinery, printing presses, transportation and office equipment, refrigerators, grocery counters, testing equipment, display racks and shelves, and neon and other signs, which is contained in or attached to a building, constitutes tangible personal property for purposes of the credit allowed by section 38. Further, all property which is in the nature of machinery (other than structural components of a building or other inherently permanent structure) shall be considered tangible personal property even though located outside a building. Thus, for example, a gasoline pump, hydraulic car lift, or automatic vending machine, although annexed to the ground, shall be considered tangible personal property. [Emphasis added.] The phrase "structural components" is defined in section 1.48-1(e)(2), Income Tax Regs., to include: such parts of a building as walls, partitions, floors, and ceilings, as well as any permanent coverings therefor such as panelling or tiling; windows and *18 doors; all components (whether in, on, or adjacent to the building) of a central air conditioning or heating system, including motors, compressors, *615 pipes and ducts; plumbing and plumbing fixtures, such as sinks and bathtubs; electric wiring and lighting fixtures; chimneys; stairs, escalators, and elevators, including all components thereof; sprinkler systems; fire escapes; and other components relating to the operation or maintenance of a building. [Emphasis added.] Petitioners claimed investment tax credit for the portion of the restaurant's concrete foundation slab located behind the counter. According to petitioners, the presence of sloped drainage basins in this floor plus the raised storage shelves around its perimeter transform this portion of the restaurant's concrete foundation slab into tangible personal property intended for special use beyond normal building requirements and thus eligible for investment tax credit. Respondent asserts that this component is not "section 38 property" as section 1.48-1(e)(2), Income Tax Regs., defines "structural components" to include a building's floors. We agree with respondent. The underlying concrete foundation slab, although slightly modified for design considerations, is clearly a structural component of the building. This is confirmed in the definition of a structural *616 component. Sec. 1.48-1(e)(2), Income Tax Regs. Section 48(a)(1)(B)(i)'s "other tangible property" specifically excludes a building's structural components. Accordingly, we need not decide whether the Taco Bell restaurant is used for "the reconstruction of scrap material" as petitioners assert and we *19 hold that respondent has carried his burden of proving that the slightly modified concrete foundation slab is not "section 38 property." Rule 142(a). Petitioners also claimed investment tax credit for the wall and floor tiles in the restaurant's food preparation, refrigeration, storage and loading areas. Petitioners contend that such tiling constitutes tangible personal property eligible for investment tax credit because it was selected for "special-use" considerations, i.e., ease of cleaning, and was not of a decorative nature suitable for general business purposes. Respondent asserts that this tiling does not constitute qualifying tangible personal property because it is a structural component permanently affixed to the building's walls and floor. In Standard Oil Co. (Indiana) v. Commissioner,77 T.C. 349, 405 (1981), which dealt with the eligibility *617 of new service station signs and lights for investment tax credit, we stated that "all tangible property constitutes 'tangible personal property' [for section 48(a)(1)(A) purposes] unless it is excluded because it is land or an 'inherently permanent structure.'" Although neither party specifically addressed the permanency considerations enunciated by this Court in Whiteco Industries, Inc. v. Commissioner,65 T.C. 664, 672-673 (1975), [9] *20 we are convinced that the tiling in issue constitutes a permanent covering for the restaurant's walls and floor; hence, it is a "structural component" and ineligible for investment tax credit. The tiles are glued to the restaurant's walls and floor. Further, section 1.48-1(e)(2), Income Tax Regs., specifically defines "structural components" to include a building's interior tiling. Accordingly, we hold that respondent has carried his burden of proving that the restaurant's tiling is not "section 38 property." Rule 142(a). *618 Petitioners also claimed investment tax credit for the plumbing and gas fixtures connecting the lessee's equipment to incoming utility "stub-outs" and electrical outlets and conduit providing localized power sources for the lessee's equipment. Petitioners' position is that such materials constitute tangible personal property eligible for investment tax credit. They *21 assert that none of these materials were part of the building's normal pluming, gas or electrical systems. Instead, each of the elements for which investment tax credit was claimed connected the lessee's specialized equipment to the building's existing utility hookups. Further, petitioners contend that, should the lease terminate, any new lessee would be unable to utilize these connectors unless they used identical equipment in the exact location used by Taco Bell, an unlikely occurrence. Finally, petitioners rely on Rev. Rul. 66-299, 1966-2 C.B. 14, in which plumbing and electrical connectors were held to be "section 38 property," for additional support of their position. Respondent, on the other hand, asserts that the plumbing and gas fixtures connecting the lessee's equipment to incoming *619 utility lines and electrical outlets and conduits providing localized power sources for the lessee's equipment do not constitute "section 38 property." In support thereof, he contends that all of these materials constitute the restaurant's "structural components" as section 1.48-1(e)(2), Income Tax Regs., which defines such, specifically includes "plumbing and plumbing fixtures, such as sinks and bathtubs; electric wiring and lighting fixtures * * *." (Emphasis added.) Finally, respondent attempts to distinguish Rev. Rul. 66-299, supra, by arguing that no special electrical or plumbing connectors which are necessary to and used directly with specific items of machinery or equipment are present in the instant situation. *22 In Scott Paper Co. v. Commissioner,74 T.C. 137 (1980), which dealt with the propriety of claiming investment tax credit with respect to petitioner's primary electric components at its paper products manufacturing plant, we examined section 1.48-1(e)(2), Income Tax Regs., which defines "structural components" and stated that: At first glance, the foregoing language seems definitely to describe certain of the primary *620 electric components, since the cables in the instant case are "electric wiring," and "electric wiring and lighting fixtures" are classified above as structural components. Although we give great weight to respondent's regulations, it would be improper to read the words "electric wiring" in a vacuum and conclude that those electric cables, therefore, must be structural components. Rather, the effect of the final element of that same subparagraph, which reads "and other components relating to the operation or maintenance of a building," must be taken into account. That final element functions as a descriptive phrase intended to present the basic test used for identifying structural components. The preceding elements are examples of items which meet that test as a general rule. Items which occur in an unusual circumstance and do not relate to the operation or maintenance of a building should not be structural components despite being listed in section 1.48-1(e)(2), Income Tax Regs. * * * Accordingly, the critical test for all primary electric improvements is whether they relate to the overall operation and maintenance of a building. See Central Citrus Co. v. Commissioner,58 T.C. 365 (1972); *621 Ponderosa Mouldings, Inc. v. Commissioner,53 T.C. 92 (1969). The focus of such a test is on the ultimate uses of power at the facility. The power used to meet the demand of process machinery is not used in the overall operation or maintenance of a building. Of the other electrical load, power used to meet the demand of yard lighting, 440-V power receptacles, and air-conditioning of the primary electric is not used in the overall operation or maintenance of a building. Other electrical load, which is used for general building services such as lighting, heating, ventilation, and *23 air-conditioning, is used in the operation or maintenance of a building. [74 T.C. at 182-184; fn. ref. omitted.] Applying the test enunciated in Scott Paper Co. to the immediate situation, it is clear that the restaurant's gas, plumbing and electrical fixtures (excluding the ornamental lighting fixtures) do not relate to general building services such as lighting, heating, ventilation, which involve the operation or maintenance of a building. Instead, all of the connectors in issue directly service the lessee's equipment and machinery. [10] The special drain *622 lines connect the lessee's refrigerators and sinks to the building's drains. The water lines provide water from the incoming water main to the lessee's steam trays, cooking vessels and ice machines. The gas connectors from the building's main gas line service the restaurant's cooking elements. Finally, the electrical outlets *24 and attendant conduit provide localized power sources for the lessee's equipment. As all of these items are necessary to and used directly with specific pieces of the lessee's equipment, we hold that the plumbing, gas and electrical connectors qualify as section 38 property for investment tax credit purposes. Scott Paper Co. v. Commissioner,supra;sec. 1.48-1(e)(2), Income Tax Regs.
*623 The final components for which petitioners claimed investment tax credit are the restaurant's interior and exterior ornamental lighting fixtures. Petitioners contend that these lighting fixtures, which match the Taco Bell motif, constitute section 38 property due to their decorative nature. Respondent asserts that these lighting fixtures constitute structural components of the building, as section 1.48-1(e)(2), Income Tax Regs., specifically defines this phrase to include "electrical wiring and lighting fixtures." Respondent also contends that since the interior ornamental lighting fixtures provide the only artificial lighting in the customer eating area, they are a "structural component" which "relates to the operation or maintenance of a building." With respect to the exterior lighting in issue, respondent contends that these lights not only illuminate the building's exterior but also provide lighting for the walkways to the building; hence, are also structural components. *25 Petitioners' contention that the ornamental lighting fixtures are purely decorative is not supported by the record. As these interior and exterior lighting fixtures provide the only artificial *624 illumination in the customer eating area and along the walkways to the building, respectively, they clearly constitute structural components of the restaurant which "relate to the operation or maintenance of a building." Scott Paper Co. v. Commissioner,supra;sec. 1.48-1(e)(2), Income Tax Regs. The ability of the Taco Bell restaurant designer to camouflage such standard lighting requirements by incorporating the Taco Bell motif into their appearance does not warrant a contrary result. Accordingly, respondent has carried his burden of proving that these lighting fixtures do not constitute section 38 property eligible for investment tax credit.[11] Rule 142(a). *625 Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954 and attendent regulations, as amended and in effect for the year in issue, and all rule references are to this Court's Rules of Practice and Procedure.↩
2. As petitioner Janet C. Duaine was not personally involved in any of the events in issue, for purposes of simplicity, we will refer only to petitioner Laurence A. Duaine when discussing this couple's tax liability.↩
3. Respondent's post-trial briefs do not further address this line of reasoning except a specific reference noting the absence of additional discussions pertaining to it.↩
4. Although we express no opinion concerning the controlling relevancy of the loan default consideration to situations in which the parties espouse more traditional agency arguments associated with the National Carbide Corp. v. Commissioner,336 U.S. 422 (1949), criteria, we have previously stated that the "Supreme Court did not intend to create a 'factor checklist' to be mechanically applied to the facts of each case * * *." Ourisman v. Commissioner,82 T.C. 171, 185↩ (1984), on appeal (4th Cir., June 25, 1984); hence, this additional consideration may warrant attention.
5. We initially observe that the parties stipulated that this document was a warranty deed despite its clear identification as an "Earnest Money Contract." Although petitioners contend that the corporation never owned the restaurant building, the existence of this document, albeit unexecuted, is certainly additional evidence to the contrary when its terms are examined in light of the parties' contentions.↩
6. The fact that the building was apparently constructed pursuant to a contract between petitioner, individually, and the builder, does not warrant a contrary result. This contract was executed approximately two months prior to the corporation's execution of the interim construction financing note; hence, it would not reflect the bank's insistence upon lending only to the corporation. Although other lenders may have insisted upon reframing the construction contract to be between the builder and the corporation, e.g., Jones v. Commissioner,640 F.2d 745, 747↩ (5th Cir. 1981), affg. a Memorandum Opinion of this Court, this detail apparently did not alarm either the lending institution or the builder in the immediate situation.
7. SEC. 267. LOSSES, EXPENSES, AND INTEREST WITH RESPECT TO TRANSACTIONS BETWEEN RELATED TAXPAYERS. (a) Deductions Disallowed.--No deduction shall be allowed-- (1) Losses.--In respect of losses from sales or exchanges of property (other than losses in cases of distributions in corporate liquidations), directly or indirectly, between persons specified within any one of the paragraphs of subsection (b). * * * (b) Relationships.--The persons referred to in subsection (a) are: (1) Members of a family, as defined in subsection (c)(4); (2) An individual and a corporation more than 50 percent in value of the outstanding stock of which is owned, directly or indirectly, by or for such individual; * * *↩
8. Respondent, citing 5 Mertens, Law of Federal Income Taxation, sec. 32A.14, p. 110 (1980), and secs. 1.48-1(d)(2) and (4), Income Tax Regs.↩, asserts that the phrase "manufacturing or production" for sec. 48(a)(1)(B)(i) purposes is "the construction, reconstruction, or making or property from or with scrap, salvage or junk material, as well as from new or raw materials, (1) by processing, manipulating, refining, or changing the form of an article or (2) by combining or assempling two or more articles, and includes the cultivation of the soil and the raising of livestock and other farm produce." Petitioners, in turn, contend that this definition includes Taco Bell "as many who have eaten there would attest '* * * reconstruction of scrap material * * *' is an all too apt description."
9. In resolving the issue of the permanence of a particular property, we have addressed the following questions: (1) Is the property capable of being moved, and has it in fact been moved? * * * (2) Is the property designed or constructed to remain permanently in place? * * * (3) Are there circumstances which tend to show the expected or intended length of affixation, i.e., are there circumstances which show that the property may or will have to be moved? * * * (4) How substantial a job is removal of the property and how time-consuming is it? * * * (5) How much damage will the property sustain upon its removal? * * * (6) What is the manner of affixation of the property to the land? * * * See also Standard Oil Co. (Indiana) v. Commissioner,77 T.C. 349, 407-409 (1981); Kimmelman v. Commissioner72 T.C. 294, 308↩ (1979).
10. We also note that respondent's Rev. Rul. 66-299, 1966-2 C.B. 14, 16, specifically states that: special electrical or plumbing connections which are necessary to and are used directly with a specific item of machinery or equipment, or between specific items of individual, machinery or equipment, are not structural components of the building, but are essentially items of machinery or equipment, and qualify as section 38 property for investment credit purposes. Although we are not bound by revenue rulings as they are "simply the contention of one of the parties to the litigation, and * * * entitled to no greater weight," Estate of Lang v. Commissioner,64 T.C. 404, 407 (1975), affd. on this issue, 613 F.2d 770, 776 (9th Cir. 1980); Minnis v. Commissioner,71 T.C. 1049, 1057↩ (1979), respondent was unable to satisfactorily distinguish the immediate factual setting from the scenario outlined in this long-standing ruling.
11. In Consolidated Freightways, Inc. v. Commissioner,708 F.2d 1385, 1390 (9th Cir. 1983), affg. in part and revg. in part 74 T.C. 768 (1980), the Court of Appeals for the Ninth Circuit reversed our determination that certain lighting fixtures were eligible for the investment tax credit. In that case, however, the only fact in the record regarding permanency was that the fixtures were easily removed. That case is, therefore, distinguishable, and, for the present, we leave undecided the question of whether we agree with the Ninth Circuit's reversal. See also Shoney's South, Inc. v. Commissioner,T.C. Memo. 1984-413 (chandeliers and hanging lanterns determined on the record therein not↩ to relate to the operation or maintenance of the building).