JOHN F. AND ANNE F. BALL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ball v. Commissioner
Docket No. 7399-87.
United States Tax Court
T.C. Memo 1989-73; 1989 Tax Ct. Memo LEXIS 73; 56 T.C.M. (CCH) 1289; T.C.M. (RIA) 89073; February 23, 1989. *73 P was a limited partner in a limited partnership formed for the purpose of investing in another limited partnership. Held: P is not entitled to deduct payments made to the general partners of the partnership in which she was a limited partner under section 212 because such payments were for services rendered in connection with the organization and syndication of that partnership and the acquisition of its only asset. Held further: P is liable for increased interest under section 6621(c) because deduction of the management fee was disallowed, at least in part, under section 709. Richard S. Kraut, for the petitioners. Diane D. Helfgott, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: Respondent determined a deficiency in petitioners' Federal income tax for the 1976 taxable year in the amount of $ 35,719.03. Respondent also determined an addition to tax for that year under section 6653(a) [1] and increased interest pursuant to section 6621(d) (hereinafter referred to as section 6621(c), as redesignated by the Internal Revenue Code of 1986). After concessions, [2] the issues for decision are: (1) Whether certain payments to the general partners of *74 a limited partnership are deductible in 1976; and (2) if not, whether deduction of such payments in that year resulted in a substantial underpayment attributable to a tax-motivated transaction within the meaning of section 6621(c). FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Stipulations and exhibits attached thereto are incorporated herein by reference. Petitioners, John F. and Anne F. Ball, resided in Greenwich, Connecticut, at the time the petition in this case was filed. John *75 F. Ball is a party because he filed jointly with his wife in 1976. All further references to petitioner are to Anne F. Ball. In February 1976, Weirton Housing for the Elderly, Ltd. (WHEL or the operating partnership) was formed as an Ohio limited partnership for the purpose of developing and operating an apartment building for the elderly in Weirton, West Virginia. WHEL's general partners, Colonial American Development Corporation (CADA), a real estate development corporation, and CADA's president, George Kontogiannis (Kontogiannis), arranged the WHEL project under a Federal program administered by the Department of Housing and Urban Development (HUD) which provides for Federal Housing Administration (FHA) mortgage insurance as well as rent subsidies. WHEL submitted an application for mortgage insurance to HUD in March 1976 and received approval in June 1976. The general partners of WHEL executed a mortgage and security agreement with the mortgagee, The Galbreath Mortgage Company (Galbreath), for a loan in the amount of $ 2,705,300 in August 1976. On the same day the mortgage was executed, WHEL entered into a construction contract with Esch & Sons Company and HUD/FHA issued its *76 initial endorsement of the project. Construction commenced later that month. Prior to the commencement of construction, Kontogiannis entered into discussions with Frank J. McKenna, Jr. and Buster A. Parker (McKenna and Parker) regarding the possibility of raising additional capital to be invested in WHEL. McKenna and Parker are broker dealers experienced at syndicating investment projects, particularly government-subsidized real estate projects. They had learned of the WHEL project from a contact at Galbreath and through their prior association with Kontogiannis on another housing project. Before attempting to locate investors, McKenna and Parker engaged in a thorough review of the project being considered for syndication to determine its financial feasibility and to fulfill their fiduciary obligation to prospective investors regarding the investigation and verification of the information to be presented to them. The review required about a week to perform and consisted of discussions with with Kontogiannis and Galbreath as well as a visit to the area in which the WHEL project is located. McKenna and Parker also analyzed copies of reports prepared by Kontogiannis for submission *77 to HUD, examined the contractor's cost breakdown, and made their own cost and revenue projections to determine the project's viability. Their previous dealings with Kontogiannis made the review somewhat easier and less time consuming but it was no less thorough than usual because the characteristics and costs differ from project to project. A favorable review of the WHEL project prompted McKenna and Parker to prepare a proposal for submission to Kontogiannis offering to acquire an interest therein through a second-tier partnership. The proposal called for the formation of a limited partnership which in turn would purchase a limited partnership interest in WHEL. McKenna and Parker have used this approach for syndicating all of their projects since 1972. The proposed agreement required little time to prepare but the important terms remained subject to negotiation. Negotiations commenced after Kontogiannis spent several months determining whether the proposal presented a competitive offer. The negotiations focused on the amount and timing of contributions to be made to WHEL in exchange for the limited partnership interest. Kontogiannis discussed cash flow with McKenna and Parker but *78 it was understood that rent restrictions limited the project's profitability. Cash flow and profitability were not critical considerations because McKenna and Parker planned on promoting the project to investors primarily interested in its tax benefits. While negotiations with Kontogiannis were ongoing, McKenna and Parker had their attorney, John James Carney, (Carney), prepare a draft of a partnership agreement for Weirton Associates, Ltd. (Weirton or the investment partnership), the second-tier limited partnership to be formed for the purpose of investing in WHEL. Coopers and Lybrand, the accounting firm that participated in the organization of Weirton, discussed with McKenna and Parker the possibility of involving one or more of its clients in the investment partnership. Coopers and Lybrand tentatively matched petitioner with Weirton after Kontogiannis agreed to the terms of investment with McKenna and Parker but before a formal agreement was executed. In November 1976, the general partners of WHEL and McKenna and Parker entered into an agreement (the November Agreement) whereby McKenna and Parker agreed to organize and syndicate a limited partnership for the purpose of investing *79 funds in WHEL. At the same time, the WHEL limited partnership agreement was amended by substituting McKenna and Parker for the original limited partners and providing that each of them receive a 2-1/2-percent equity interest in WHEL in exchange for $ 50. Shortly thereafter, WHEL amended its partnership registration to provide for the admission of Weirton as a limited partner. Pursuant to the November Agreement, WHEL was to acquire a limited partnership interest in WHEL by making a capital contribution of $ 435,000 and receiving in exchange a 98-percent interest in WHEL's profits and losses and a 45-percent interest in its equity. The agreement called for payment of the capital contribution in installments due in the amounts and on the dates that follow: Amount
Due Date
$ 60,000
11/1/76
75,000
5/1/77
55,000
8/1/77
75,000
2/1/78
85,000
8/1/78
85,000
2/1/79 The November Agreement conditioned payment of the installments beginning February 1, 1978, on final endorsement by HUD/FHA, completion of the project in accordance with the plans and specifications, and free and clear title to the property except for certain encumbrances specifically described therein. Although the total capital contribution *80 was payable in installments, the November Agreement provided for the admission of WHEL as a limited partner upon receipt by WHEL of the first installment and placement and registration of one-half of the investment partnership's limited partnership units. McKenna and Parker worked more closely with Coopers and Lybrand toward syndication of Weirton after the execution of the November Agreement. Coopers and Lybrand prepared statements of profit and loss, cash flow, and other data based upon McKenna and Parker's preliminary projections. After finalization of the financial data and preparation of an offering memorandum, McKenna and Parker put together a deal for petitioner with Coopers and Lybrand acting as her representative. Parker subsequently met with petitioner for the purpose of introducing the project and reviewing the specifics of the deal. Upon verification of petitioner's financial qualifications, McKenna and Parker determined her to be a suitable investor and the deal was closed. On December 20, 1976, petitioner became Weirton's sole investing partner by purchasing all 100 of its limited partnership units at a rate of $ 5,000 per unit for a total purchase price of $ 500,000. *81 As provided in the Weirton Limited Partnership Agreement, petitioner executed a commitment agreement requiring her to pay that amount in installments due in the amounts and on the dates that follow: Amount
Due Date
$ 65,000
12/20/76
87,500
4/10/77
87,500
7/10/77
87,500
2/1/78
87,500
7/10/78
85,000
2/1/79
Petitioner also executed a promissory note in the amount of $ 435,000 representing the balance of the installment payments due after the closing date. The promissory note conditioned payment of the last three installments upon conditions practically identical to those set forth in the November Agreement, i.e., final endorsement by HUD/FHA, completion of the project in accordance with the plans and specifications, and free and clear title to the property except as otherwise provided. Weirton immediately assigned petitioner's promissory note to WHEL in accordance with the November Agreement. Petitioner's $ 500,000 capital contribution constituted Weirton's sole source of capital, other than the $ 50 contribution made by each of its original partners, McKenna, Parker, and Carney. Petitioner received a 95-1/2-percent interest in Weirton's profits and losses, cash flow, and equity in exchange for *82 her contribution. Each of the other three partners received a 1-1/2-percent interest. Carney received his interest in exchange for his $ 50 contribution and McKenna and Parker received their interests in exchange for their $ 50 contributions together with "all their rights, title and interest in and to the November Agreement * * *." In its offering memorandum, Weirton projected cash distributions of up to $ 60,000 payable to the general partners as a management fee and $ 5,000 associated with the miscellaneous expenses of the offering. Weirton utilized the remainder of petitioner's contribution, $ 435,000, to fund the purchase of its limited partnership interest in WHEL. The Weirton Limited Partnership Agreement described the $ 60,000 to be paid to McKenna and Parker, $ 30,000 in 1976 and $ 30,000 in 1977, as "a management fee, administrative fee and salary * * * for their services to the [Investment] Partnership in their capacity as an employee and/or consultant in connection with overseeing the contractual obligations of the General Partner of the Operating Partnership under the November Agreement." The services rendered by McKenna and Parker in this connection primarily involved *83 monitoring the progress of the project to determine whether to make the scheduled installment payments or withhold them pending satisfaction of the requirements upon which such payments were conditioned. McKenna and Parker discharged their duties by conducting a limited investigation into the progress of the WHEL project. The investigation entailed occasional telephone conversations with Kontogiannis and Galbreath, which were sometimes initiated in connection with other projects. McKenna and Parker also requested and reviewed copies of summaries of the construction draw reports mailed to them by Galbreath. These reports reflected requests for draws upon the construction loan by the general contractor, approved by the architect, and submitted to the FHA and Galbreath. The FHA and Galbreath undertook independent inspections of the construction progress prior to approving any of the requested draw-downs. Although no correlation existed between the installment payments and the draw-downs on the construction loan, McKenna and Parker relied upon the information they received from Galbreath to determine whether to make the installment payments as scheduled. McKenna and Parker neither *84 inspected the site nor inquired about the project from anyone actually associated with the construction before making the installment payments. The FHA and Galbreath never denied any draw-down requests nor did McKenna and Parker withhold any of the installment payments due from Weirton to WHEL. The building was certified for partial occupancy on January 3, 1978, and leases commenced for the finished units on that date even though final endorsement of the project, originally expected to take place in February 1978, did not occur until October of that year. McKenna and Parker neither participated directly in the rent-up activities nor performed a post-construction audit. Upon final endorsement by HUD/FHA, McKenna and Parker considered as discharged the duties for which Weirton was paying them $ 60,000. Weirton compensated McKenna and Parker separately at a rate of approximately $ 1,000 per year for the services they routinely rendered thereafter. Those services consisted of administrative tasks such as bookkeeping, reviewing the monthly reports Weirton received, and coordinating the year-end tax activities. Weirton reported a management fee in the amount of $ 55,000 [3] and unspecified *85 miscellaneous expenses in the amount of $ 2 as "other deductions" on its 1976 Federal partnership return. The only other item reported thereon was a loss of $ 28,570 which constituted Weirton's distributive share of the loss reported by WHEL. Petitioners, on their individual 1976 Federal income tax return, claimed a distributive share of the total loss reported by Weirton. In his notice of deficiency, respondent determined that petitioner was entitled to deduct her share of Weirton's loss but only in an amount reduced to reflect his disallowance of the "other deductions" in their entirety. OPINION This controversy focuses primarily on the oft-litigated dichotomy created by the distinction drawn between capital and ordinary expenditures. Petitioner bears the burden of proving that she is entitled to a current deduction for her distributive share of the "other deductions" disallowed by respondent. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Respondent contends that none of the management *86 fee is deductible because the entire fee must be capitalized as a cost attributable to the organization and syndication of Weirton. [4] *87 Respondent further contends that, even if a portion of the fee is not attributable to such costs, the entire amount should be capitalized because no reasonable basis exists for allocation between capital and noncapital expenditures. Petitioner argues that only an inconsequential part, if any, of the fee is allocable to costs incurred for services rendered in connection with the organization and syndication of Weirton. Weirton was availed of solely for investment purposes and because its investment activities never rose to the level of a trade or business petitioner relies on section 212 rather than section 162 as authority for the deductions claimed. [5] *88 Although a partnership cannot deduct nonbusiness expenses under section 212 in computing its taxable income, sec. 703(a)(2)(E), it can incur expenses under that section which are deductible by its partners. [6] See sec. 1.702-1(a)(8)(i), Income Tax Regs.; Rev. Rul. 75-523, 1975-2 C.B. 257; Durkin v. Commissioner,87 T.C. 1329, 1388 n. 19 (1986); Tolwinsky v. Commissioner,86 T.C. 1009, 1058 n. 21 (1986). Section 212 provides for the deduction of all the ordinary and necessary expenses paid or incurred during the taxable year for the production or collection of income or for the management, conservation, or maintenance of property held for the production of income. No current deduction is allowed, however, for expenditures otherwise deductible under section 212 which are capital in nature. Sec. 1.212-1(n), Income Tax Regs. Costs incurred in connection with the organization and syndication of limited partnerships are capital in nature. Kimmelman v. Commissioner,72 T.C. 294, 304 (1979); Cagle v. Commissioner,539 F.2d 409, 415 (5th Cir. 1976), affg. 63 T.C. 86 (1974). *89 Costs incurred in connection with the acquisition of a capital asset are also capital in nature. Woodward v. Commissioner,397 U.S. 572, 576 (1970). As part of the Tax Reform Act of 1976, Congress enacted section 709 which deals specifically with costs incurred in organizing and syndicating a partnership. Tax Reform Act of 1976, Pub. L. 94-455, sec. 213(b), 90 Stat. 1547. Section 709(a) applies to partnership taxable years beginning after December 31, 1975, and it precludes the deduction of both organization costs and syndication expenses. Tax Reform Act of 1976, Pub. L. 94-455, sec. 213(f)(1), 90 Stat. 1548. Section 709(b) provides a limited exception under which a partnership may elect to amortize and deduct its organizational costs ratably over a period of not less than 60 months; however, that exception only applies to expenses paid or incurred during taxable years beginning after December 31, 1976. Tax Reform Act of 1976, Pub. L. 94-455, sec. 213(f)(3), 90 Stat. 1549. Accordingly, expenses paid or incurred during the year in issue must be capitalized to the extent they are allocable to organizational costs and syndication expenses. The determination of whether the so-called *90 management fee is currently deductible under section 212 depends upon the nature of the services performed by McKenna and Parker rather than the designation or treatment of that fee by the investment partnership. Doyle v. Mitchell Bros. Co.,247 U.S. 179, 187 (1918); Durkin v. Commissioner, supra;Estate of Boyd v. Commissioner,76 T.C. 646, 657-658 (1981). Petitioner bears the burden of proving what portion of the fee constitutes deductible expenses. Tolwinsky v. Commissioner, supra at 1059; Estate of Boyd v. Commission, supra at 658; Kimmelman v. Commissioner, supra at 305. Petitioner's allocation must reasonably comport with the value of the services performed by McKenna and Parker. Tolwinsky v. Commissioner, supra;Wildman v. Commissioner,78 T.C. 943, 958 (1982); Merians v. Commissioner,60 T.C. 187, 188 (1973). To support the deductibility of the management fee, petitioner offered the testimony of McKenna who described the services he and Parker rendered to Weirton. Based upon McKenna's testimony, we find that he and Parker provided the following services: reviewed the WHEL project, negotiated the November Agreement, coordinated the organization and syndication of Weirton, *91 monitored the progress of the WHEL project on behalf of Weirton, and performed routine administrative tasks for Weirton. There is, however, no substantive evidence in the record which establishes the extent or value of the several different services. Petitioner steadfastly maintains that payment of the management fee compensated McKenna and Parker only for those services rendered in connection with monitoring the progress of the WHEL project and that no part of the management fee is allocable to the other substantial services rendered to Weirton by McKenna and Parker. [7] McKenna's testimony is the only evidence in the record regarding allocation. McKenna first testified that he and Parker received the management fee for monitoring the progress of the WHEL project on behalf of Weirton. McKenna later testified that a portion of the management fee actually constituted payment for certain unspecified preliminary services rendered to Weirton by him and Parker. Presumably such services were either in connection with the organization and syndication of Weirton or in connection with the acquisition of its only asset, specifically, reviewing the WHEL project and negotiating an agreement *92 to acquire an interest therein. McKenna's testimony regarding the value of the preliminary services is unsupported by bills or records itemizing such services or the time spent on each. McKenna placed the value of the preliminary services at "between 10 and 15, 20 percent" of the $ 60,000 management fee and, although it is not entirely clear from his testimony, he apparently believes that if a separate payment had been made for those services, such payment would have been in an amount somewhere between $ 5,000 and $ 10,000. His testimony in this regard appears to have no particular connection to the value of the services actually rendered. Rather, McKenna's estimate of the value of such services apparently corresponds to what he perceives as the "standard fee" currently charged by syndicators *93 rendering similar services. McKenna's own extensive testimony regarding the extent of the preliminary services rendered by him and Parker belies his estimate of the their value. The unreasonableness of McKenna's allocation is particularly obvious when the services he and Parker performed in connection with organizing and syndicating Weirton and acquiring its only asset are compared to the monitoring services they rendered thereafter. In short, we decline to accept McKenna's testimony as a reasonable basis for allocating the management fee between deductible and nondeductible expenses. Petitioner argues against allocation of the management fee to organization and syndication expenses on several grounds. [8] First, petitioner asserts that separate payments were made for such services by Weirton out of her $ 500,000 capital contribution. To the extent Weirton made such separate payments, they would necessarily have been limited to $ 5,000 because the record establishes that the other $ 495,000 of petitioner's contribution was used to pay the $ 60,000 management fee and the $ 435,000 purchase price of Weirton's interest in WHEL. Thus, petitioner's capital contribution could not have been *94 the source of separate payments for organization and syndication expenses in excess of $ 5,000. Nothing in the record indicates that the costs incurred in that connection were so limited, particularly in light of the substantial services rendered by McKenna and Parker, Carney, and Coopers and Lybrand. Second, petitioner asserts that no part of the management fee is attributable to syndication costs because McKenna and Parker expended only a minimal amount of effort in arranging for petitioner to invest in Weirton. Petitioner's assertion contradicts the evidence in the record and, therefore, we reject it. The record reveals that McKenna and Parker performed *95 substantial syndication services on behalf of Weirton. They located petitioner through Coopers and Lybrand and worked with that accounting firm in presenting the investment opportunity to her. McKenna and Parker also verified petitioner's financial qualifications before involving her as an investor. Third, petitioner asserts that McKenna and Parker were compensated for the services they rendered in connection with the organization and syndication of Weirton by means other than cash compensation. Petitioner contends that McKenna and Parker each received a 2-1/2 percent equity interest in WHEL as compensation for arranging for her to invest in Weirton. The WHEL partnership agreement and the November Agreement both indicate that McKenna and Parker received their respective interests in WHEL in exchange for $ 50 capital contributions. Even if we view the equity interests as being compensatory in nature, that compensation would be in connection with services performed on behalf of WHEL and not Weirton. [9] *96 Furthermore, the November Agreement makes it clear that WHEL had no financial responsibility for the expenses incurred in syndicating Weirton. Petitioner further contends that the 1-1/2-percent interest McKenna and Parker each received in Weirton's profits and losses, cash flow, and equity constitutes compensation for services they rendered in organizing and syndicating that partnership. McKenna and Parker each contributed $ 50 and "all their rights, title and interest in and to the November Agreement" in exchange for their respective interests in Weirton. In his testimony, McKenna described the value given up by him and Parker in the exchange as being a product of the effort they expended prior to reaching an agreement with WHEL. Because the November Agreement specifies the terms for the acquisition by Weirton of its only asset, a limited partnership interest in WHEL, we view the price paid for the rights under that agreement and the services rendered in reaching it, the 3-percent interest in Weirton, as being an expense connected with acquiring an asset for the partnership. Woodward v. Commissioner,397 U.S. 572, 576 (1970) *97 (ancilliary expenses incurred in acquiring an asset are as much a cost of the asset as is the purchase price); cf. Spangler v. Commissioner,323 F.2d 913, 921 (9th Cir. 1963), affg. a Memorandum Opinion of this Court. Such an expense is neither an organizational cost, sec. 1.709-2(a), Income Tax Regs., nor a syndication expense, sec. 1.709-2(b), Income Tax Regs., and, therefore, we find that McKenna and Parker did not receive their interests in Weirton in return for rendering organization and syndication services. Fourth, petitioner attempts to distinguish this case from those cases in which we have held the management fee paid by a limited partnership to its general partner not to be deductible because the services rendered for such fee were actually in connection with the organization and syndication of the partnership. See, e.g., Towlinsky v. Commissioner,86 T.C. 1009 (1986); Kimmelman v. Commissioner,72 T.C. 294 (1979). In deciding those cases, we found that the general partners were instrumental in organizing and syndicating their respective partnerships and that by comparison the administrative services they performed were relatively minor. We allowed no deduction in either *98 case because the taxpayers failed to prove what portion of the management fee, if any, was allocable to administrative services. Towlinsky v. Commissioner, supra at 1060; Kimmelman v. Commissioner, supra at 306. We reach a substantially similar result here despite petitioner's effort to distinguish this case on the basis of the services McKenna and Parker purportedly rendered in exchange for payment of the management fee. Like the general partners in Towlinsky and Kimmelman, McKenna and Parker were instrumental in the organization and syndication of Weirton and they performed administrative tasks [10] comparable to those performed by the general partners in those cases. Nevertheless, petitioner argues on brief that the results reached in Towlinsky and Kimmelman should not apply here because McKenna and Parker received the management fee in question for rendering services unrelated to either the organization and syndication of Weirton or the administration of its affairs. As we noted in Towlinsky, however, there are very few "management services" that a general partner can provide to a purely passive investment vehicle such as Weirton. See also Keller v. Commissioner,79 T.C. 7, 49-50 (1982), *99 affd. 725 F.2d 1173 (8th Cir. 1984). McKenna testified as follows in summarizing the services he and Parker purportedly rendered in return for the management fee: "Our services were primarily for managing the assets of [the investment] partnership and for taking on the responsibility of making sure that the conditions of the contracts were satisfied and really acting as a buffer and additional protection for the investor * * *." Overseeing the contractual obligations of the general partners of WHEL under the November Agreement did not require McKenna and Parker to get too involved in the WHEL project nor were they permitted to because the FHA maintained total control over that project. McKenna and Parker merely monitored the project's progress for the purpose of determining whether to make the installment payments to WHEL which were conditioned on final endorsement by HUD/FHA, completion of the project in accordance with the plans and specifications, and free and clear title to the property except as otherwise provided. Discharging such monitoring duties *100 required little effort on their part because the progress of the WHEL project was being much more closely monitored by Galbreath and HUD/FHA. In determining whether to pay the scheduled installments, McKenna and Parker simply relied upon the information they received from Galbreath. We do not question whether McKenna and Parker performed such services but we doubt that the allocation of the entire management fee to those services reasonably comports with their value. See Wildman v. Commissioner,78 T.C. 943, 958 (1982); Merians v. Commissioner,60 T.C. 187, 188 (1973). It is unlikely that McKenna and Parker were paid a management fee the size of the one at issue here for determining whether to make installment payments based on information they received from Galbreath regarding the progress of the WHEL project. Furthermore, the contractual conditions which McKenna and Parker were responsible for verifying applied only with respect to Weirton's last three installments, the earliest of which was scheduled for February 1, 1978. Accordingly, we find that the evidence in the record does not support allocation of the management fee here at issue to the services McKenna and Parker rendered *101 "in connection with overseeing the contractual obligations of the General Partner of the Operating Partnership under the November Agreement." Because petitioner has given us no basis for valuing such services, we are not in a position to allocate any portion of the management fee to them. [11]Towlinsky v. Commissioner, supra at 1060. On the other hand, the evidence strongly suggests that the management fee was paid to McKenna and Parker for putting a deal *102 together with WHEL. McKenna and Parker performed substantial services in connection with the organization and syndication of Weirton and its acquisition of a limited partnership interest in WHEL. They reviewed the WHEL project, conducted negotiations with Kontogiannis, and ultimately reached an agreement providing for the purchase of an interest therein. At the same time, McKenna and Parker worked with Carney and Coopers and Lybrand organizing Weirton to serve as an investment vehicle. In addition, McKenna and Parker engaged in syndication efforts as previously described. These services were all performed during 1976, and McKenna and Parker received no fees for rendering such services other than the management fee at issue. [12] *103 Under these circumstances, we must conclude that payment of the management fee to McKenna and Parker compensated them for services rendered in connection with the organization and syndication of Weirton and its acquisition of a limited partnership interest in WHEL and, thus constitutes a nondeductible capital expenditure. Section 6621(c) provides for an increased rate of interest with respect to any substantial underpayment attributable to a tax-motivated transaction. This rate increase applies for interest accruing after December 31, 1984. Solowiejczyk v. Commissioner,85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). Section 6621(c)(2) defines a "substantial underpayment" as an underpayment exceeding $ 1,000. Section 6621(c)(3)(A) enumerates types of transactions considered to be "tax motivated transactions" and that list includes "(iv) any use of an accounting method specified in regulations prescribed by the Secretary as a use which may result in a substantial distortion of income for any period." The Treasury promulgated temporary regulations prescribing accounting methods "which *104 may result in a substantial distortion of income." See sec. 301.6621-2T, Q&A-3, Proced. & Admin. Regs., T.D. 7998, 49 Fed. Reg. 50931 (Dec. 28, 1984), 1985-1 C.B. 368. These regulations provide, in pertinent part: Q-3. What accounting methods may result in a substantial distortion of income for any period under [section 6621(c)(3)(A)(iv)]? A-3. A deduction or credit disallowed, or income included, in any of the circumstances listed below shall be treated as attributable to the use of an accounting method that may result in a substantial distortion of income and shall thus be a tax motivated transaction that results in a tax motivated underpayment: * * * (4) Any deduction disallowed for any period under section 709, relating to organization or syndication expenditures of a partnership; Respondent determined in his notice of deficiency that a part or all of petitioner's underpayment for 1976 is attributable to tax-motivated transactions. Petitioner argues that section 6621(c) should not apply because it would run counter to Congressional housing policy by discouraging investors like herself from investing in housing projects administered by HUD/FHA. We reject petitioner's argument *105 as being without merit because we know of no authority, nor does she cite us to any, indicating that Congress intended investors investing in housing projects administered by HUD/FHA to receive any tax benefits beyond those generally available to other taxpayers. Blitzer v. United States,684 F.2d 874, 895-896 (Ct. Cl. 1982). Disallowance of deductions pursuant to section 709, regarding organization and syndication expenses, falls squarely within the provisions of the temporary regulations and is to be treated as resulting from a tax-motivated transaction. Sec. 6621(c)(3)(A)(iv). Respondent disallowed the deduction petitioner claimed for her distributive share of the $ 55,000 management fee and she has failed to establish that payment of such fee was not for services rendered in connection with the organization and syndication of Weirton or the acquisition of its only asset. No provision exists which would treat the disallowance of a deduction for fees allocable to services rendered in the latter connection as attributable to a tax-motivated transaction. However, in the absence of a basis for allocation, we hold that section 6621(c) applies with respect to the entire underpayment *106 because disallowance of the deduction at issue is, at least in part, attributable to such a transaction. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise noted, all section references are to the Internal Revenue Code of 1954, as in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. In his notice of deficiency, respondent denied petitioners a deduction for Anne F. Ball's distributive share of the unspecified miscellaneous expenses of a limited partnership in the amount of $ 2. Other than an unsupported assignment of error in the petition, petitioners have not responded to this determination and, therefore, we consider the issue to have been conceded by them. On brief, respondent conceded the addition to tax made pursuant to section 6653(a).↩
3. There is no evidence in the record explaining how Weirton arrived at the amount of the management fee, $ 55,000, which it reported as "other deductions" on its 1976 Federal partnership return.↩
4. Respondent argues that the management fee is not deductible because it compensated McKenna and Parker for services they rendered in connection with the organization and syndication of Weirton. In making his argument on brief, respondent incorrectly categorizes the costs of "investigating and negotiating for the purchase of partnership assets" as organizational expenses. Costs connected with acquiring assets for a partnership are not organizational expenses. Sec. 1.709-2(a), Income Tax Regs. But because costs connected with acquiring capital assets are capital in nature, Woodward v. Commissioner,397 U.S. 572, 576 (1970), respondent's argument applies with equal force notwithstanding his mischaracterization of such costs as organizational expenses. We will treat the costs attributable to the organization and syndication of Weirton and the costs connected with the acquisition of its only asset, a limited partnership interest in WHEL, separately only where such treatment is necessary to clarify our decision in this case.
5. Although respondent relied upon section 162 rather than section 212 in determining the deductibility of the management fee in the notice of deficiency, the question of whether petitioner was entitled to deduct her distributive share of such fee pursuant to section 212 was raised in the petition. In his answer, respondent denied that petitioner was entitled to a deduction under section 212↩. 6. Petitioner argues for a deduction under section 212 even though she claimed her distributive share of the loss reported on the partnership return of income for the year in issue rather than separately accounting for her share of the nonbusiness expenses as provided in sec. 1.702-1(a)(8)(i), Income Tax Regs.↩
7. McKenna's undisputed testimony reveals that Weirton compensated him and Parker separately at a rate of about $ 1,000 per year for performing routine administrative tasks such as bookkeeping, coordinating year-end tax activities, and reviewing statements Weirton received monthly after the WHEL project was completed. Thus, no part of the management fee is allocable to such administrative services.↩
8. Like respondent, petitioner draws no distinction between the services McKenna and Parker rendered in connection with the organization and syndication of Weirton and those rendered in connection with acquiring its interest in WHEL, specifically, reviewing the WHEL project and negotiating an agreement to acquire an interest therein. See n. 4, supra.↩ Nevertheless, costs incurred for services rendered in either connection are capital expenditures and we will draw a distinction only where necessary to clarify our decision in this case.
9. McKenna testified that he and Parker provided a service to WHEL by finding investors to invest funds in the WHEL project. However, the arrangement between WHEL and McKenna and Parker is not relevant to our inquiry into the nature of the services they rendered on Weirton's behalf.
10. McKenna testified that he and Parker were separately compensated for performing such administrative tasks. See n. 7, supra.↩
11. Our decision not to allocate any portion of the management fee to such services makes it unnecessary for us to consider respondent's alternate contentions: Whether any portion of the management fee allocated to such services, particularly, verifying the completion of construction, must be capitalized as a cost of acquiring an asset, Weirton's interest in WHEL, or whether any portion of the management fee allocated to such services, particularly, ensuring that construction of the WHEL project was completed in a timely fashion, must be capitalized as a cost incurred in connection with the construction of a capital asset. For the same reason, we need not decide whether Weirton properly accrued a deduction for such services in 1976.↩
12. McKenna and Parker each received a 1-1/2 percent interest in Weirton and, although it is not entirely clear from the record, receipt of such interest was partly in exchange for services they rendered in reviewing the WHEL project and negotiating the November Agreement. This does not foreclose the possibility that the management fee constituted further compensation for those same services, particularly in light of McKenna's testimony that the interests he and Parker received in Weirton were of relatively little value.